# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **RANDY STROUD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:06cv1175 HEA** |
| | ) | **TCM** |
| **STEVE LARKINS,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The 28 U.S.C. § 2254 petition of Randy Stroud ("Petitioner"), a Missouri prisoner, for federal habeas corpus relief is before the undersigned United States Magistrate Judge for a review and a recommended disposition.  See 28 U.S.C. § 636(b).

## Background

At the beginning of Petitioner's trial on charges of first degree murder and armed criminal action, the prosecutor told the jury, in part, that Petitioner stabbed Devon Lenard in the chest with a knife although Lenard did not have a weapon, did not throw a punch, and did not say a word to Petitioner.  (Resp't Ex. A-1 at 241-42.)  The prosecutor further told the jury that Petitioner; Petitioner's nephew, Jason Stroud ("Jason"); his brother, Chuck Stroud ("Chuck"); and Lenard all worked at United Fruit and Produce ("United Fruit").  (Id. at 242-

---

[1]By earlier Order, the Court granted Petitioner leave to amend his petition to include the name of the current warden of the Missouri Eastern Reception Diagnostic and Correctional Center where he is confined.  Since that Order, Steve Larkins has been named warden.  See Missouri Dep't of Corrections, http://www.doc.mo.gov/division/adult/address.htm (last visited July 23, 2009).

43.) The Strouds had worked there a long time. (Id. at 244.) Lenard had worked there for only a few weeks, had left earlier that evening without permission, and had been fired. (Id.) Lenard later returned and had a verbal confrontation with Petitioner. (Id. at 245.) They then went their separate ways. (Id. at 246.) Ten minutes later, there was another confrontation and Petitioner fatally stabbed Lenard. (Id. at 247-50.) Trial counsel told the jury that Lenard was drunk and belligerent when he returned that night, attacked Petitioner, and was stabbed in self-defense. (Id. at 259-61.)

The State's eyewitnesses all worked either for United Fruit or Dierberg's Markets ("Dierberg's"). Dierberg's had employees working at Produce Row next to United Fruit. Scott Lehmann, testified that, at approximately 2:00 in the morning on January 12, 1999, Lenard was walking by himself toward Lehmann on the front dock, not appearing to be angry, not carrying anything, and not saying anything. (Id. at 274, 280-81, 300.) Petitioner, appearing to be angry, and Jason walked toward Lenard, met him, and fought. (Id. at 282-83.) Lenard fell down. (Id. at 284-86.) There was a scuffle; Lehmann saw Petitioner hunched over Lenard with his back to Lehmann. (Id. at 286-87, 322, 327-28.) Jason was standing by Lenard. (Id. at 286, 328.) Lehmann did not see Lenard take any offensive action. (Id. at 288, 340.) Everyone then got up. (Id.) Lenard lifted his shirt, revealing blood all over it, and said he needed an ambulance. (Id. at 289.) Lenard and another man, Leonard Parott, went into an office. (Id.) Petitioner stood there with a bloody knife. (Id. at 289, 290.) Someone told Petitioner to leave, and he did. (Id.) Lehmann further testified on

cross-examination that he had not smelled alcohol on Lenard's breath, nor had he noticed him staggering.  (Id. at 306.)  Lehmann did not see Terry Little.  314, 340-41

Parott was the next witness to testify.  He had supervised Lenard, and had fired him that night after not being able to find him during work hours.  (Id. at 345-46, 351, 352.) Lenard appeared to be drunk.  (Id. at 368.)  Later that night, when Lenard had returned and was hanging around, he saw Jason and Gene Bargery talking about something.  (Id. at 353-54.)  Parott suspected that something was going to happen and followed the two men as they went toward the front dock.  (Id. at 354.)  When he caught up with them, the two men and Petitioner were standing around Lenard.  (Id. at 356.)  Lenard was on one knee, against an office wall, and trying to stand up.  (Id. at 356, 363.)  Trying to protect Lenard, Parott grabbed him under the arm and told him to leave the building.  (Id. at 357.)  At that point, Lenard asked for an ambulance and stumbled into the  office.  (Id. at 357, 375.)  Parott saw Petitioner in the doorway.  (Id. at 359, 375.)  He described Petitioner's look as angry and his eyes as wild.  (Id. at 359-60.)  He told Petitioner to "get out of [t]here."  (Id. at 360.)

Jason Stroud testified that at the time in question he heard Petitioner tell another man, John Cline, that Cline "need[ed] to get the guy out of there before he [Petitioner] f**** him up."[2]  (Id. at 383.)  Jason suggested to Bargery that they go watch the fight.  (Id.)  They did. (Id.)  When the two men caught up with Petitioner, they saw him and Lenard wrestling on the ground.  (Id. at 386.)  Lenard did not have a weapon.  (Id.)  Jason further testified that

---

[2]On cross-examination, he also testified that Petitioner might not have said that.  (Id. at 433-34.)

he kicked Lenard approximately three times in an effort to protect Petitioner. (<u>Id.</u> at 387, 411.)  He could not recall whether he punched Lenard. (<u>Id.</u> at 387.)  He did not see Petitioner stab Lenard, nor did he stab him. (<u>Id.</u> at 388.)  Later when Jason and Petitioner were in a cell together, Petitioner said he could not believe he had done "it." (<u>Id.</u> at 393.)  Petitioner said nothing about self-defense. (<u>Id.</u>)  On cross-examination, Jason testified that he was interviewed for two hours, during which time his statement was transcribed, and then gave a videotaped statement. (<u>Id.</u> at 419-25.)  When his oral statement was being transcribed, the officers would tell him that that was not how it had happened if he said anything they felt was incorrect. (<u>Id.</u> at 420.)

Another worker present that night, Wes Borden, testified that Jason was the first to reach Lenard, he hit him in the face and continued hitting and kicking Lenard after he fell to the ground. (<u>Id.</u> at 466-67.)  Lenard did not hit back. (<u>Id.</u> at 466, 468, 474.)  As Lenard lay on the ground, Petitioner stabbed him in the chest with a sharp object. (<u>Id.</u> at 467.)  Lenard then stumbled into the office; Petitioner left. (<u>Id.</u> at 469-70.)

Bargery testified that in the early morning hours of January 12, he overheard Petitioner tell Cline that he was going to "f***" Lenard up. (Resp't Ex. A-2 at 582-83.)  Bargery suggested to Jason that they go and watch. (<u>Id.</u> at 583.)  When he and Jason caught up to Petitioner, he saw Petitioner hit Lenard in the shoulder. (<u>Id.</u> at 585.)  Lenard fell to the ground. (<u>Id.</u>)  Bargery then turned around and started to walk away. (<u>Id.</u> at 586.)  When he turned back around, he saw Lenard go into an office and say that he needed an ambulance. (<u>Id.</u> at 587-88.)

A forensic pathologist testified that Lenard died of one stab wound to the chest. (<u>Id.</u> at 507, 516, 522.)  Lenard also had injuries to the right side of his face consistent with being punched.  (<u>Id.</u> at 529-30.)  He had a small amount of cocaine and twice the legal limit of alcohol in his blood.  (<u>Id.</u> at 508-09.)

A police officer testified that Petitioner made a statement admitting to having stabbed Lenard.  (<u>Id.</u> at 643.)  He did not state he did it in self-defense.  (<u>Id.</u>)  Petitioner also stated that he threw the knife he had used off a bridge.  (<u>Id.</u> at 664.)  An injury to his finger might have been caused by him punching Lenard.  (<u>Id.</u> at 673.)  Petitioner's videotaped statement, approximately 30 minutes in length, was played for the jury.  (<u>Id.</u> at 667-68.)  The officer tried to contact Terry Little, but Little did not return his phone calls.  (<u>Id.</u> at 706, 707-08.)

John Cline was the first witness to testify in Petitioner's behalf.  He had to have Lenard escorted off the docks earlier that night when Lenard refused to leave as twice directed.  (<u>Id.</u> at 743-44, 747-49.)  He next saw Lenard when he and Petitioner were shoving each other in the parking lot.  (<u>Id.</u> at 751, 753.)  After a short match, the two men broke it off; Lenard walked toward the front gate.  (<u>Id.</u> at 753.)  When Cline again saw Lenard, Lenard was walking toward a sandwich machine on the dock.  (<u>Id.</u> at 757.)  When he next, and last, saw Lenard, Lenard had entered Parott's office and fallen to the ground.  (<u>Id.</u> at 764.)  That was all he saw of an altercation.  (<u>Id.</u>)  Cline further testified that Petitioner never told him he was going to "f***" Lenard up.  (<u>Id.</u> at 801.)

Terry Little, a United supervisor, heard Lenard say that night that he was going to "f***" Petitioner up.[3]  (Id. at 818-19.)   Lenard then ran toward Petitioner, who tried to protect himself.  (Id. at 819.)  The two men wrestled – Little saw no blows or stabbing.  (Id. at 820.)  After the two men got up, Lenard slipped and fell on some water and hit the floor.  (Id. at 821.)  Jason came up and kicked Lenard; Lenard stood up again and said he had been stabbed.  (Id. at 822.)  He did not see Borden or Lehmann on the dock that night during Petitioner's and Lenard's altercation.  (Id. at 830, 832, 846.)  Little, who is six feet five inches tall, testified that he saw more than Borden, Lehmann, Jason, or Bargery had.  (Id. at 832-33.)  He had known the three Strouds for six years and Lenard for two weeks.  (Id. at 831-32.)  He had not contacted police or returned their phone calls because he had recently been in a car accident and was concerned there was a warrant out on him.  (Id. at 827-29, 835.)  He never did talk to police about what he had seen.  (Id. at 839.)  He had twice given a statement to Petitioner's trial counsel, and had been taken to his office by Chuck.  (Id. at 848, 849-50.)

Petitioner was the next, and last, witness.  He testified that he was on break early in the morning of January 12, sitting in Jason Schueren's, co-worker, van and drinking beer,[4] when Lenard approached and asked him, with a liberal use of profanity, to go get a dock worker for him.  (Id. at 861-62.)  Petitioner refused; Lenard became enraged and tried to

---

[3]He did not hear Petitioner say anything similar.  (Id. at 822.)

[4]A few hours earlier, he had been on another break and had drunk "a couple of beers."  (Id. at 861.) He testified that he was not intoxicated or impaired in any way.  (Id.)  On cross-examination, he testified that he had had six beers in a four-hour period.  (Id. at 896.)

prevent Petitioner from leaving the van.  (<u>Id.</u> at 864-65.)  When Petitioner did get out of the

van, he and Lenard got into a shoving match.  (<u>Id.</u> at 865.)  The match quickly ended; Lenard

drove away.  (<u>Id.</u>)  Petitioner returned to work, spoke with the man Lenard had asked him

to contact, and headed to the front dock to speak with someone "about getting security."  (<u>Id.</u>

at 866-67.)  Lenard rushed Petitioner.  (<u>Id.</u> at 868.)  They fought.  (<u>Id.</u>)  Petitioner had heard

a rumor that Lenard had a gun.  (<u>Id.</u>)  Petitioner was afraid for his life.  (<u>Id.</u> at 871.)  Lenard

tried to tackle Petitioner.  (<u>Id.</u> at 868.)  They both fell to the floor and wrestled.  (<u>Id.</u> at 871-

72.)  Someone pulled Lenard off of Petitioner; he thought it was Jason.  (<u>Id.</u> at 873.)

Petitioner saw blood on his knife and stopped Jason "from doing whatever he was gonna do."

(<u>Id.</u> at 874.)  The fight ended.  (<u>Id.</u>)  Parott told him to leave.  (<u>Id.</u> at 876.)  He threw the

knife off a bridge.  (<u>Id.</u> at 878.)  When he was told to return to Produce Row, Schueren gave

him a ride.  (<u>Id.</u> at 880.)  He told Schueren that he had been trying to defend himself and

might have accidentally stabbed Lenard.  (<u>Id.</u> at 881.)  He tried to tell the police that he had

acted in self-defense and had not meant to stab Lenard.  (<u>Id.</u> at 887.)  They told him he could

not say so in his statement.  (<u>Id.</u> at 887, 917, 919.)  His testimony was more accurate than

the statement he had given seventeen months earlier.  (<u>Id.</u> at 902-03.)  On cross-examination,

he explained that his earlier videotaped statement that he had talked with Cline that night was

a mistake.  (<u>Id.</u> at 909.)  He thought Lenard might have fallen on his (Petitioner's) knife.  (<u>Id.</u>

at 923.)

       In addition to armed criminal action, the jury was instructed on first degree murder,

second degree murder, voluntary manslaughter, involuntary manslaughter, and self-defense.

(Resp't Ex. B at 55-67.)  For a guilty verdict of second degree murder, the jury had to find that Petitioner caused Lenard's death by stabbing him, that he "knew or was aware that his conduct was causing or practically certain to cause the death of Devon Lenard or that it was [his] purpose to cause serious physical injury to or cause the death of Devon Lenard," that he had not acted "under the influence of sudden passion arising from adequate cause," and that he had not acted in self-defense.  (Id. at 57.)  The jury returned a verdict of guilty of second degree murder and armed criminal action, and recommended a sentence of twenty years' imprisonment on the murder charge and five years on the armed criminal action charge.  (Id. at 75-76.)

At sentencing, the trial judge made the following comments.

Now, the matter was tried to a jury.  The jury returned its verdict.  While this Court does not agree with this verdict, this Court will follow the jury's decision and will impose the sentence that was recommended by that jury. . . .

The jury made its decision.  Like I said, I don't agree with that decision, but I think it was their decision.  They heard the evidence.  I do not believe that you deliberately killed that man that night.  I think it was tragic what happened.

(Resp't Ex. A-3 at 8, 9.)  The court ordered the two sentences recommended by the jury to run concurrently.  (Id. at 10.)

Petitioner appealed on the grounds that the evidence was insufficient that he had intended to cause death or serious physical injury to Lenard and that he had not acted under the influence of sudden passion arising from an adequate cause.  (Resp't Ex. C at 10.)

In addressing Petitioner's argument that there was no substantial evidence of intent, the appellate court noted the eyewitness's testimony that Petitioner "stabbed Victim in the

heart while Victim was lying on the ground trying to protect himself. A killing by the use of a deadly weapon on a vital part of the victim's body is sufficient to permit a finding of intent to kill. The chest, which contains the majority of a person's vital organs, is a vital area. . . ." (Resp't Ex. E at 4.) (Internal quotations and citation omitted.) In addressing his argument that the State had failed to disprove that he had not acted under sudden passion arising from adequate cause, the court noted that fifteen to thirty minutes had passed from the confrontation at the van between Lenard and Petitioner to the fight at the front dock. (Id. at 5.) This was sufficient time for Petitioner to cool off. (Id.) Also, the evidence showed that Lenard had done nothing when on the dock to give rise to sudden passion. (Id.) Lenard did not initiate the second fight, nor did he do anything during the fight to provoke Petitioner. (Id.) And, the evidence of Petitioner's statement about "f***[ing]" Lenard up and a witness's statement that Petitioner pulled something out of his pocket before confronting Lenard reasonably implied that he had formed the intent to seriously injure Lenard before they met. (Id. at 5-6.)

Petitioner next moved for post-conviction relief pursuant to Missouri Supreme Court Rule 29.15. (Resp't Ex. H at 5-11.) The motion was amended by appointed counsel and alleged, inter alia, that trial counsel had been ineffective for failing to call Eugene Carr as a witness. (Id. at 16-19.) Carr would have testified that Lenard attacked Petitioner first. (Id. at 16.) In a second amended motion,[5] Petitioner alleged that trial counsel was ineffective for

_____

[5]This motion is incorrectly titled a "First Amended Motion."

failing to call as witnesses Carr, Jim "Doe," Jason Schueren, Jerry Voloski, and Alfred Blakemore.  (<u>Id.</u> at 24.)  Voloski would have testified that he called security to have Lenard removed from the property, that he helped escort Lenard out before the fight, and that before the fight Lenard was asking for money and causing trouble.  (<u>Id.</u> at 27.)  Blakemore would have testified that he had made a report after the fight and then had destroyed his notes after the police told him they would handle the investigation.  (<u>Id.</u>)  He would also have testified that he had been paged several times that night to have Lenard removed from the property.  (<u>Id.</u> at 28.)

Voloski, Carr, and Blakemore testified at the evidentiary hearing, in addition to Petitioner, his trial counsel, and his brother, Chuck.  (Resp't Ex. G.)  Voloski's testimony was as anticipated.  (<u>Id.</u> at 42-43, 45-46.)  He did not see the fight; he did not remember speaking with trial counsel, but could have.  (<u>Id.</u> at 44, 48.)  Carr saw a little bit of the fight, did not see the beginning or how it started, and did not see Petitioner stab Lenard.  (<u>Id.</u> at 51-52, 53, 54-55.)  He did not see Jason at the fight, but explained that he did not have a good view.  (<u>Id.</u> at  54, 55.)  He would "probably" have testified if asked.  (<u>Id.</u> at 52.)  He could not have added anything to Petitioner's theory of self-defense.  (<u>Id.</u> at 57-58.)  His brother has been married to Petitioner's sister for 30 years.  (<u>Id.</u> at 52-53.)  Blakemore is a police officer for the City of St. Louis and works for United as second job.  (<u>Id.</u> at 60.)  He did not see the fight, and was home at the time.  (<u>Id.</u> at 61.)  He offered the investigating police officers his notes of interviews he had had with various United employees, but destroyed them after being told they were not needed.  (<u>Id.</u> at 62-63.)  Petitioner's trial counsel testified he spoke

with various witnesses, including Carr, Voloski, and Blakemore. (Id. at 78, 79, 80.) He did

not call Carr as a witness because he could have added nothing and would have been subject

to a negative cross-examination about his failure to speak with police and his relationship to

Petitioner. (Id. at 78-79.) Voloski's testimony would not have added to that already given

by Cline. (Id. at 79.) He would have liked to have Blakemore's notes, but they had been

destroyed. (Id. at 80.) Aside from those notes, Blakemore was of no assistance. (Id.)

The court denied relief, finding that Petitioner had failed to establish that the decision

not to call the named witnesses was not trial strategy and that the testimony of those

witnesses would not have supported his theory of self-defense. (Resp't Ex. H at 39-40.)

Again, Petitioner appealed on one ground: trial counsel was ineffective for not calling

Carr, Voloski, and Blakemore. (Resp't Ex. I at 14.) The appellate court held his argument

lacked merit, finding that trial counsel had made "a conscious decision not to call Voloski,

Carr and/or Blakemore to testify following reasonable investigation." (Resp't Ex. K at 7.)

> Here, trial counsel offered reliable testimony that he decided not to call
> these witnesses because investigation revealed that: (1) Carr did not see the
> beginning of the altercation and, therefore, could not offer testimony as to who
> started the fight; (2) Voloski's testimony would have been cumulative to that
> presented by Cline, only less reliable, in that Voloski did not witness anything
> first-hand; and (3) in light of the fact that Blakemore was not present at the
> time of the murder and he could not testify specifically as to what Terry Little
> said, because the notes of that conversation had been destroyed.

> Likewise, the presentation of testimony from these three witnesses
> would not have changed the outcome of trial because the testimony would not
> have assisted [Petitioner's] self-defense theory. Specifically, in his testimony
> at the evidentiary hearing, Voloski testified that he was not even present at
> United Fruit and Produce when [Petitioner] stabbed Victim. Likewise, Carr
> testified that he was 90 feet away from the fight between [Petitioner] and

Victim, had no idea how the fight started or who started it. To that end, Carr testified that he could not have added anything to [Petitioner's] self-defense theory. Moreover, Blakemore testified that he was at home when the murder happened. Accordingly, [Petitioner's] contention that the presentation of testimony from these witnesses would have changed the outcome of trial is without merit.

(Id. at 7-8.)

Petitioner now seeks federal habeas relief on the two grounds presented in his state court appeals.

## **Discussion**

Standard of Review. Title 28 U.S.C. § 2254(d) mandates that a federal court grant habeas relief "only if the adjudication by the state court 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law' or 'resulted in a decision that was based on an unreasonable determination of the fact,' which factual findings carry a presumption of correctness that will be rebutted only by clear and convincing evidence." **Kenley v. Bowersox**, 275 F.3d 709, 711 (8th Cir. 2002) (quoting § 2254(d)); accord **Evans v. Rogerson**, 223 F.3d 869, 871 (8th Cir. 2000). A state appellate court's decision "will 'be contrary to' clearly established federal law if the controlling Supreme Court cases require a 'different outcome' or a 'particular result.'" **Mark v. Ault**, 498 F.3d 775, 784 (8th Cir. 2007). The decision will be an "unreasonable application" if it "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" **Id.** at 786 (quoting Collier v. Norris, 485 F.3d 415, 421 (8th Cir. 2007)) (alteration in original). This standard

requires that the application be "objectively unreasonable." **Id.** "It is not enough for the federal habeas court to conclude that, in its independent judgment, it would have applied federal law differently from the state court . . . ." **Id.** See also **Williams v. Taylor**, 529 U.S. 362, 410 (2000) (noting that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law"). State courts's decisions are to be given "'the benefit of the doubt.'" **Mark**, 498 F.3d at 786 (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)).

And, "'[t]o the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness . . . of the state court's treatment of the contested issues.'" **Copeland v. Washington**, 232 F.3d 969, 974 (8th Cir. 2000) (quoting Long v. Humphrey, 184 F.3d 758, 761 (8th Cir. 1999)) (alterations in original).

Sufficiency of the Evidence. Citing the trial court's sympathetic remarks at sentencing and arguing that her comments and interpretation of the evidence are entitled to deference, Petitioner first claims that there was insufficient evidence of the intent necessary to support a conviction for second degree murder and insufficient evidence that he did not act out of sudden passion arising from adequate cause.

Due process and the Sixth Amendment "require criminal convictions to 'rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" **United States v. Gaudin**, 515 U.S. 506, 510

(1995); accord **Jackson v. Virginia**, 443 U.S. 307, 324 (1979); **Johns v. Bowersox**, 203 F.3d 538, 543 (8th Cir. 2000).  "In applying this standard, [t]he scope of [the Court's] review . . . is extremely limited. . . .  [The Court] must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and . . . must defer to that resolution."  **Whitehead v. Dormire**, 340 F.3d 532, 536 (8th Cir. 2003) (first, third, and fourth alterations in original) (internal quotations omitted).  Moreover, a federal court is not permitted to make its own determination as to a witness's credibility; that determination is for the state court trier of fact.  **Robinson v. LaFleur**, 225 F.3d 950, 954 (8th Cir. 2000).  Where conflicting evidence is presented, it is presumed that the jury resolves any conflicting inferences in the prosecution's favor.  See **Id.**

Under Missouri law, a defendant may be convicted of second degree murder if he "[k]nowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person . . . ."  Mo.Rev.Stat. § 565.021.1(1).  Also under Missouri law, "[a] killing by the use of a deadly weapon on a vital part of the victim's body is sufficient to permit a finding of an intent to kill."  **State v. Craig**, 33 S.W.3d 597, 600 (Mo. Ct. App. 2000).  At the end of his fight with Lenard, Petitioner held a bloody knife.  A knife is clearly a deadly weapon.  See **Id.** (iron bar is deadly weapon).  At the end of the fight, Lenard was bleeding from his chest and later died of one stab wound to the chest.  "The chest, which contains the majority of a person's vital organs, is a vital area.  Evidence that defendant struck a vital part of [the victim's] body with

a deadly weapon is sufficient to show intent." **Id.** Clearly, the evidence was sufficient to show Petitioner caused Lenard's death by stabbing him in the chest. It is the adjective "knowingly" that is at the heart of Petitioner's challenge. Petitioner does not contend that he did not know that he *could* cause Lenard's death by stabbing him the chest. Rather, he contends that he did not know, and the State failed to sufficiently prove, that he *was* stabbing Lenard in the chest.

Petitioner elected to have his case heard by a jury. That jury listened to testimony that Petitioner had told other workers that he was going to harm Lenard, that he then started a fight with Lenard, that he was hunched over Lenard as Lenard lay on the ground, that Lenard never threw a punch at Petitioner or otherwise attempted to strike him, that Lenard was bleeding from the chest when he stood up, and that Petitioner had a bloody knife in his hand at the end of the fight. "[E]ven in a homicide case, the circumstances need not be absolutely conclusive of guilt and they need not demonstrate the impossibility of [the defendant's] innocence; the mere existence of other hypotheses is not enough to remove the case from the . . . trier of fact." **State v. Clark**, 272 S.W.3d 432, 438 (Mo. Ct. App. 2008) (first and third alterations in original) (internal quotations omitted). The trier of fact in Petitioner's case was the jury, not the trial judge.[6] "The credibility and weight of testimony are for the fact-finder to determine." **Id.** (internal quotations omitted). The fact-finder in Petitioner's case

---

[6]The Court notes that the trial court recognized this distinction in roles. Indeed, the trial court denied trial counsel's motion for judgment of acquittal at the conclusion of the evidence, thereby leaving the question of Petitioner's guilt to the jury.

determined that Petitioner knowingly stabbed Lenard in the chest. See **Gibbs v. Kemna**, 192 F.3d 1173, 1176 (8th Cir. 1996) (rejecting challenge to sufficiency of evidence of state court conviction where habeas petitioner's arguments were directed to reliability or credibility of witnesses and not to sufficiency of the evidence).

Petitioner further argues that the evidence is insufficient that he did *not* act under the influence of sudden passion arising from adequate cause. In Missouri, "sudden passion" is "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." Mo.Rev.Stat. § 565.002(7). "Sudden passion is not established when a reasonable person had time for the passion to cool." **Craig**, 33 S.W.3d at 600. It is also not established "unless a defendant show the victim took some action to inflame the defendant and that the defendant was not the initial aggressor." **State v. Stidman**, 259 S.W.3d 96, 102 (Mo. Ct. App. 2008). "Adequate cause" is "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." Mo.Rev.Stat. § 565.002(1). Adequate cause "must result from a sudden, unexpected encounter or provocation tending to excite the passion beyond control." **Craig**, 33 S.W.3d at 600. "Acting under the influence of sudden passion arising from adequate cause is a special negative defense to the crime of conventional second degree murder." **Stidman**, 259 S.W.3d at 102.

The jury could have believed Petitioner's trial testimony that Lenard was the aggressor and that he accidentally stabbed Lenard when defending himself.[7] It did not. The jury could also have believed the testimony that Petitioner was the initial aggressor and that he stabbed Lenard when Lenard was on the ground. The jury did. As noted above, in a due process challenge to the sufficiency of the evidence, it is presumed that the jury resolves any conflicting inferences in the prosecution's favor. **Robinson**, 225 F.3d at 954. See also **Whitehead**, 340 F.3d at 536 (habeas court must presume that "trier of fact resolved all conflicting inferences in the record in favor of the state"); **Miller v. Lock**, 108 F.3d 868, 870 (8th Cir. 1997) (conflict in various witnesses's testimony about petitioner's whereabouts at time of crime was for jury to determine and not ground for habeas relief based on insufficient evidence); **Meadows v. Delo**, 99 F.3d 280, 282 (8th Cir. 1996) (habeas petitioner's contention that evidence was insufficient because it was based only on testimony of "junkies offered deals with the State" was of no consequence because "[i]t was for the jury to judge the witnesses' credibility") (internal quotations omitted). Petitioner is clearly challenging the jury's credibility findings. His challenge is without merit.

For the foregoing reasons, his sufficiency of the evidence argument is unavailing.

Ineffective Assistance of Trial Counsel. Petitioner also challenges as ineffective assistance of trial counsel his counsel's failure to call Carr, Voloski, and Blakemore as

---

[7]The state appellate court held that the earlier shoving match between Petitioner and Lenard had occurred too long before the fight to support a finding of *sudden* passion.

witnesses. Carr saw a brief portion of the fight, but did not see its beginning or see who was the aggressor. Voloski and Blakemore did not see the fight.

"The right to effective assistance of counsel 'is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process.'" **Smith v. Rogerson**, 171 F.3d 569, 572 (8th Cir. 1999) (quoting <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986)). "'The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [relevant proceeding] cannot be relied on as having produced a just result.'" **Jackson v. Gammon**, 195 F.3d 349, 354 (8th Cir. 1999) (quoting <u>Kellogg v. Skon</u>, 176 F.3d 447, 452 (8th Cir. 1999)) (second alteration in original). "Only reasonable competence, the sort expected of the ordinary fallible lawyer, is demanded by the Sixth Amendment." **White v. Helling**, 194 F.3d 937, 941 (8th Cir. 1999) (internal quotations omitted). Moreover, "[t]here is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy." **Garrett v. Dormire**, 237 F.3d 946, 949-50 (8th Cir. 2001).

To establish that counsel's lack of competence violated the Sixth Amendment, the petitioner must show that counsel's performance was deficient and prejudicial. **Kellogg**, 176 F.3d at 452. To establish that counsel's performance was deficient, a petitioner must show that counsel "'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" **Greiman v. Thalacker**, 181 F.3d 970,

972 (8th Cir. 1999) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish prejudice, a petitioner must demonstrate "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" **Id.** (quoting Strickland, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" **Carroll v. Schriro**, 243 F.3d 1097, 1100 (8th Cir. 2001) (quoting Strickland, 466 U.S. at 694). "'In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.'" **Lawrence v. Armontrout**, 31 F.3d 662, 666 (8th Cir. 1994) (quoting Strickland, 466 U.S. at 695). The burden of showing a reasonable probability is the petitioner's. **Lawrence v. Armontrout**, 961 F.2d 113, 115 (8th Cir. 1992).

The question of prejudice from counsel's performance need not be reached if the performance was not deficient. See **Parkus v. Bowersox**, 157 F.3d 1136, 1140 (8th Cir. 1998). Conversely, the question of counsel's allegedly deficient performance need not be reached if a petitioner has failed to show prejudice. See **Strickland**, 466 U.S. at 697; **Hoon v. Iowa**, 313 F.3d 1058, 1061 (8th Cir. 2002); **Siers v. Weber**, 259 F.3d 969, 974 (8th Cir. 2001). Thus, if a petitioner has failed to show that, but for an allegedly deficient performance by his trial counsel, there is a reasonable probability that the outcome of his trial would have been different, his claim of ineffective assistance of counsel fails. **Morales v. Ault**, 476 F.3d 545, 550 (8th Cir.), cert. denied, 128 S.Ct. 177 (2007).

Additionally, to prevail in this § 2254 proceeding on an ineffective assistance claim, Petitioner "must establish that the state court applied [the foregoing standard] to the facts of his case in an objectively unreasonable manner.'" **Ringo v. Roper**, 472 F.3d 1001, 1003 (8th Cir.) (quoting Bell v. Cone, 535 U.S. 685, 699 (2002)), cert. denied, 128 S.Ct. 445 (2007).

Carr did not witness any portion of the fight that was not already described by other witnesses. He could not testify that Lenard was the aggressor, as alleged by Petitioner in his post-conviction motion. Voloski did not have any contact or dealings with Lenard that another witness, John Cline, had not had and had not testified about. It is not ineffective assistance of counsel not to call a witness whose testimony would have been cumulative. See **Paul v. United States**, 534 F.3d 832, 838 (8th Cir. 2008); **Winfield v. Roper**, 460 F.3d 1026, 1034 (8th Cir. 2006); **Hall v. Luebbers**, 296 F.3d 685, 693 (8th Cir. 2002). Blakemore was at home when the fight occurred and had destroyed his notes of his interviews, thus foreclosing any impeachment use they might have had.

Trial counsel spoke with Cole, Voloski, and Blakemore and decided not to call these witnesses because their testimony would have been cumulative, irrelevant, or both. The Missouri Court of Appeals' finding that this was a strategic decision and not ineffective assistance of trial counsel is not an unreasonable application of the Strickland standard. See 28 U.S.C. § 2254(d)(1).

## Conclusion

Petitioner raises two grounds for habeas relief. Both are without merit. Accordingly,

**IT IS HEREBY RECOMMENDED** that the 28 U.S.C. § 2254 petition of Randy Stroud be **DENIED** without further proceedings.

The parties are advised that they **up to and including August 10, 2009**, by which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of  July, 2009.